NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

_____
:
KRISTENSONS PETROLEUM, INC.,     :
                                 :
          Plaintiff,             :     Civil Action No. 14-5683-BRM-TJB
                                 :
     v.                          :
                                 :
EXPLORER MARITIME CRUISES, LLC   :
and TRAVEL DYNAMICS              :     OPINION
INTERNATIONAL, LTD,              :
                                 :
          Defendants.            :
_____:

**MARTINOTTI, DISTRICT JUDGE**

Before this Court are: (1) Defendant Travel Dynamics International, LTD's ("TDI") Motion for Summary Judgment (ECF No. 47) and (2) Plaintiff Kristensons Petroleum, Inc.'s ("KPI") Cross-Motion for Summary Judgment (ECF No. 48). Both motions are opposed. (ECF Nos. 48, 49, and 50.) Pursuant to Federal Rule of Civil Procedure 78(b), the Court did not hear oral argument. For the reasons set forth below, both Motions for Summary Judgment are **DENIED**.

**I.   BACKGROUND**

   **A.   The Charter Agreement**

Aquarius Cruises ("Aquarius") was a Delaware LLC formed in March 2011 to purchase and own the vessel M/V Yorktown ("Yorktown"). (TDI's Statement of Facts (ECF No. 47-1) ¶ 1 and KPI's Response to TDI's Statement of Facts (ECF No. 48-16) ¶ 1.) In August 2011, Aquarius purchased the Yorktown. (ECF No. 47-1 ¶ 1 and ECF No. 48-16 ¶ 1.) On November 16, 2011, Aquarius was renamed Explorer Maritime Cruises LLC ("EMC"). (ECF No. 47-1 ¶ 2 and ECF No. 48-16 ¶ 2.) Explorer was formed by brothers George and Vasos Papagapitos, both of whom

1

have a 25% interest in the company. (KPI's Counter Statement of Facts (ECF No. 48-17) ¶ 19 and TDI's Response to KPI's Counter Statement of Facts (ECF No. 49-1) ¶ 19.) Their children own the remaining 50%. (ECF No. 48-17 ¶ 19 and ECF No. 49-1 ¶ 19.)

TDI is a New York corporation also formed by the brothers in 1969. (ECF No. 47-1 ¶ 3 and ECF No. 48-16 ¶ 3.) George is the President of TDI and Vasos is the Vice-President of TDI. (ECF No. 47-1 ¶ 3 and ECF No. 48-16 ¶ 3.) From 1969 to 2014, TDI organized, marketed and operated educational cruises aboard small passenger vessels. (ECF No. 47-1 ¶ 4 and ECF No. 48-16 ¶ 4.)[1] In December 2011, TDI chartered the Yorktown from EMC on a time charter basis pursuant to a Cruise Charter Agreement ("Charter Agreement"). (ECF No. 47-1 ¶ 5; ECF No. 48-16 ¶ 5; and Charter Agreement (ECF No. 47-31) at 1 of 10.) The Charter Agreement stated, in relevant part:

> c) The following operational costs and expenses shall be borne by the Owner:
> (i) A full complement of officers and crewmembers, as to the Vessel's Technical Management and Hotel Management services.
> (ii) All port charges and embarkation taxes related fees.
> (iii) All insurance premiums for the policies and coverage required of Owner under the terms of this Charter Agreement.
> (iv) All of the Vessel's operational expenses including, but not limited to, crew wages and overtime, fuels, costs for repairs and maintenance, all stores, provisions and other consumables, and other items incidental to the efficient management and operation of a ship of Vessel's sixe and classification.

---

[1] TDI also chartered Corinthian II (the "Corinthian"), owned by Helios Shipping Ltd, which is not the subject of this action. (ECF No. 48-17 ¶ 1.)

(ECF No. 47-1 ¶ 6; ECF No. 48-16 ¶ 6; and ECF No. 47-31 at 3 of 10 to 4 of 10.)[2] During the term of the Charter Agreement period, TDI, as the charterer, was required "to pay the Owner for the hiring of the Vessel the sum of Twenty-Eight Thousand Five Hundred ($28,500.00) per day."[3] (ECF No. 47-1 ¶ 7; ECF No. 48-16 ¶ 7; ECF No. 47-31 at 3 of 10.) The Charter Agreement does not mention KPI or create any relationship between KPI and either or both EMC and/or TDI. (ECF No. 48-16 ¶¶ 5-7.) The Charter Agreement was entered into after the inception of KPI's business relationship with the Yorktown. (ECF No. 48-17 ¶ 17 and ECF No. 49-1 ¶ 17.) KPI was never provided a copy of the Charter Agreement until the inception of this lawsuit. (ECF No. 48-17 ¶ 20 and ECF No. 49-1 ¶ 20.) The Charter Agreement was modified on April 12, 2012. (Amended Charter Agreement (ECF No. 48-5).)[4]

### B. KPI Supplies Fuel to the Yorktown

KPI is a worldwide fuel bunkering service company, which buys and sells marine fuels to masters, owners, charterers, operators, and managers of vessels and barges. (ECF No. 47-1 ¶ 10; ECF No. 48-16 ¶ 10; and ECF No. 48-17 ¶ 1.) In 2011, Marissa McGuire ("McGuire"), a trader at KPI, contacted Vasos, the Vice President of TDI and Co-President of EMC, to offer KPI's services to the Yorktown. (ECF No. 47-1 ¶ 11 and ECF No. 48-16 ¶ 11.) A Google search for "vessels and

---

[2] TDI's Yorktown travel brochure stated TDI "reserves the right to charge a fuel supplement, without prior notice, if the NYMEX oil price exceeds $85 per barrel." (Yorktown Brochure (ECF No. 48-15).)

[3] EMC's only revenue came from the daily charter hire paid to it by TDI. (ECF No. 48-17 ¶ 24 and ECF No. 49-1 ¶ 24.) The parties dispute whether or not TDI has actually paid the "daily charter hires." (ECF No. 48-17 ¶ 25 and ECF No. 49-1 ¶ 25.)

[4] The amendments, modifications, and additions to the Charter Agreement are immaterial. The only noteworthy difference is that the Amended Charter Agreement contains a discrepancy regarding the daily charter hire amount TDI is obligated to pay KPI. (ECF No. 48-5 at 2.) Paragraph 4(a) suggests TDI would pay a daily charter hire of $28,500, and Paragraph 4(c) suggests TDI would pay a daily charter hire of $29,000. (*Id.*)

companies" produced TDI, and therefore, McGuire contacted TDI to attempt to get their business. (Marissa McGuire Dep. (ECF No. 47-6) at 31:9-18.) TDI put her in contact with Vasos, who stated he was the person responsible for making decisions regarding the fueling of the Yorktown. (*Id.*) According to McGuire, when she contacted Vasos, she knew he was the owner of TDI and that he owned the Yorktown under "a different legal entity, but [] thought it was all under Vasos." (*Id.* at 30:4-6.) She was also aware Vasos was the owner of EMC and that EMC owned the Yorktown. (*Id.* at 35:25-36:4, 29:10-13.) McGuire knew EMC and TDI were separate entities but believed Vasos was the one behind it all and that all entities were under the care of TDI. (*Id.* at 36:6-9, 69:12-16.) Ian Sharpe, the former Director of Finance and current Chief Accountant of KPI, also knew EMC was the owner of the Yorktown and that EMC and TDI were separate entities. (ECF No. 47-1 ¶ 13 and Ian Sharpe Dep. (ECF No. 47-12) at 19:17-23, 25:23-26:4, 29:18-30:2.)

Typically, KPI performs due diligence before providing bunkering services to a vessel to ensure the companies with which it is dealing are financial sound. (ECF No. 47-12 at 34:22-35:6.) Because KPI grants unsecured credit and only has a lien against the vessel, it tries to find out what it can about a company and does not "grant[] credit lightly." (*Id.* at 35:1-6.) Therefore, KPI "cull[s] vessel[] reports from the Lloyd's List, usually off some registry, so [it] would find out who owns the vessel, . . . and try to do some research to make sure [it] can tie the companies together." (*Id.* ECF No. 47-12 at 33:11-16.) In addition, KPI

> would ask for financial statements, we would ask for any background information they would give us. We would do typical internet searches. We would search-there are number of industry related services, Lloyd's List is one of them.
> You know, we try to find out as much as we can, you know, any news articles, any marketing materials. We talk to the client, find out, you know, who they are, what they know. We would try to find out as much as we can about our counterparties.

> We'd ask for financial statements, typically audited statements. If it's a public company there's obviously plenty available with the SEC.

(*Id.* at 34:6-21.) KPI performed this due diligence on the Yorktown and requested financial statements from Vasos in September 2011. (ECF No. 48-17 ¶ 5.) On September 28, 2011, McGuire emailed Vasos at his TDI email address stating:

> This morning I will work on establishing your credit line and requested payment terms. Please send me your audited financial statements as well as any references you have.
>
> Also, interestingly enough, KPI has worked with the vessel Yorktown in the past through its previous owners Cruise West and Clipper Cruise Lines to supply all of her fuel and lubricants sense [sic] 2002! I have many records in the office regarding her fuel and lubricant consumption. We are very excited to continue working with this vessel now through Travel Dynamics.

(ECF No. 48-3 at 8-9.) In response, on September 28 and 29, 2011, respectively, Vasos provided TDI's bank as a reference and TDI's financial statements, which he sent from his TDI email address. (ECF No. 48-3 at 3-8.)

KPI first supplied fuel to the Yorktown in approximately October 2011. (ECF No. 47-6 at 62:23-63:17.) Vasos was the initial contact for purchasing fuel at this time, but later referred McGuire to the captain of the Yorktown and provided her with the captain's email address, a TPI email address. (ECF No. 48-3.) On October 6, 2011, Vasos emailed KPI from his TDI email address thanking KPI for "facilitating the bunkering." (ECF No. 48-3 at 2.)

The first order confirmation form for the bunkering was made to buyer "M/V Yorktown and/or master/ owners/ charterers/ managers/ operators and/or Aquarious Cruises c/o Travel Dynamics International" and to the attention of Vasos. (ECF No. 47-10.) Thereafter, all requests for fuel came directly from the Yorktown's captain or chief engineer. (ECF No. 47-1 ¶ 22 and ECF No. 48-16 ¶¶ 22-23.) The chief engineer's email address was a Yorktown email address. (ECF No.

5

47-8.) At some point, the captain's email address changed from a TDI email address to a Yorktown email address. (ECF No. 47-22.) After Aquarius became EMC, all order confirmations were addressed to "M/V Yorktown and/or master/ owners/ charterers/ managers/ operators and/or Explorer Maritime Cruises LLC c/o Travel Dynamics International" with attention to the captain of the vessel. (ECF No. 47-1 ¶ 27 and ECF No. 48-16 ¶¶ 22-23.) KPI used TDI as a "c/o" address "because [it was] never provided an address for [EMC]." (ECF No. 47-12 at 50:22-51:1.) KPI typically used "a care of address . . . to mail to a non-permanent address or an address where you know someone else or some other entity is residing . . . [a]nd they are going to take responsibility for that and pass it on." (*Id.* at 51:8-13.)

On November 15, 2011, Alexandra Lee, assistant comptroller of TDI, emailed McGuire to request assistance from KPI's Accounting Department. Specifically, she asked that all billing for the Yorktown be billed to Aquarius. (ECF No. 47-11.) KPI admits changes to the invoices were made and that it complied with its client's request. (ECF No. 47-1 ¶ 33 and ECF No. 48-16 ¶ 33.) On March 12, 2012, Yen Lee, the controller for TDI, emailed McGuire also requesting "that any bunkering for . . . Yorktown be billed to Aquarius Cruises LLC." (ECF No. 47-1 ¶ 34; ECF No. 48-16 ¶ 34; and ECF No. 47-3 at 37:14-16.) On March 13, 2012, Yen Lee informed McGuire that Aquarius had been renamed EMC and that it would "appreciate if you can make that change in your system as well." (ECF No. 47-1 ¶ 35 and ECF No. 48-16 ¶ 35.) KPI complied with all requested changes and changed the name of TDI sub-accounts to Aquarius and eventually EMC. (ECF No. 48-16 ¶¶ 34-35.) Therefore, KPI had an account exclusively for EMC regarding the fueling for the Yorktown. (ECF No. 47-6 at 84:22-85:1.)

KPI offered a line of credit to EMC and agreed to a 60-day payment schedule. (ECF No. 47-6 at 84:22-85:1.) As the due date for KPI's invoices for the Yorktown would approach 60 days,

Yen Lee would typically send postdated checks from EMC to pay down the balance. (ECF No. 47-6 at 91:16-20, 94:2-3.) However, in October 2013, EMC's bank prevented a check from clearing to KPI to cover an invoice for fuel for the Yorktown. (ECF No. 47-1 ¶ 43 and ECF No. 48-16 ¶ 43.) Therefore, TDI stepped in and made the payment in order to allegedly "avoid arresting the vessel and disrupting the cruise and inconveniencing the passengers." (ECF No. 47-3 at 111:6-15.) KPI's internal accounting reflects EMC made every payment for invoices issued by KPI for the Yorktown from its own account, except for the October 2013 payment made by TDI. (Account Statements (ECF No. 47-19).)[5] Notably, during discovery KPI learned that two of the bank accounts from which KPI was routinely paid from for the fuel services provided to the Yorktown were delineated as "Explorer Maritime Cruises, LLC [doing business as] Travel Dynamics International" and "Explorer Maritime Cruises, LLC [trading as] Travel Dynamics International." (ECF No. 48-17 ¶ 52 and ECF No. 49-1 ¶ 52.)

### C. KPI Seeks Payment For Outstanding Invoices From EMC

On March 18, 2014, Sharpe wrote a letter to Vasos stating, "Per our conversation we understand that it is your intention to sell MV Yorktown. We would just like to remind you that the vessel can not [sic] transfer hands free and clear until the following invoices have been settled. Please find invoice details listed below." (ECF No. 47-20.) The letter excerpted KPI's amounts receivable workbook and listed unpaid invoices for the client "Explorer Maritime Cruises LLC" from November 2013 through March 2014. (*Id.*) On April 15, 2014, KPI emailed Vasos stating the "[b]alance overdue on Yorktown ($424k) to be remitted us [sic] directly from German Bank, KFW Bank, Details hereto by Monday 14th April 2014." (ECF No. 47-21 at 3.) KFW Bank was

---

[5] TDI made many payments for invoices issued by KPI for the Corinthian from its own account even though that vessel was owned by Helios. (ECF No. 47-1 ¶ 31 and ECF No. 47-19.)

the Yorktown's new owner. (ECF No. 47-1 ¶ 52 and ECF No. 48-16 ¶ 52.) On April 17, 2014, after receiving a response from Vasos stating he submitted the amount due on the Yorktown to the German KFW Bank, KPI again requested for Vasos to "push on 'Yorktown' matters on Tuesday as we would like to keep our principals at bay since we (read Jesper) have guaranteed that funding in full for settling matter is on its way from KFW Bank." (ECF No. 47-21 at 2.) On June 9, 2014, McGuire emailed Vasos concerning the "Explorer Maritime-Interest Invoice" and attached the Interest Note, which was addressed to "Explorer Maritime Cruises LLC c/o Travel Dynamics International." (ECF No. 47-59.)

### D. Maritime Lien on the Yorktown

On June 14, 2014, KPI filed a Notice of Claim of Lien ("Lien Notice") with the United States Coast Guard to assert a maritime lien on the Yortown. (Lien Notice (ECF No. 47-5).) The Lien Notice identified the vessel owner as "Explorer Maritime Cruises LLC c/o Travel Dynamics International." (*Id.*) Attached to the Lien Notice was a copy of all unpaid invoices listing "Explorer Maritime Cruises LLC" as the client on the amounts receivable. (*Id.*) EMC has admitted it is responsible for the payment of the outstanding invoices. (ECF No. 47-1 ¶ 58 and ECF No. 48-16 ¶ 58.)

### E. Procedural History

On September 12, 2014, KPI filed a Complaint against both TDI and EMC, demanding $424,426.23 plus interest and legal fees for the outstanding invoices owed. (Compl. (ECF No. 1).) On June 29, 2015, the Court dismissed KPI's Complaint without prejudice as to TDI because KPI relied on matters extraneous to the pleadings to oppose the motion to dismiss and allowed KPI to file an amended complaint by July 29, 2015. (Memo. Order (ECF No. 25).) On July 29, 2015, KPI filed an Amended Complaint, alleging: (1) breach of express contract; (2) breach of implied

8

contract; (3) unjust enrichment; and (4) alter ego/veil piercing. (Am. Compl. (ECF No. 26).) On March 30, 2016, the Court granted in part and denied in part TDI's motion to dismiss. (Order (ECF No. 34).) Specifically, the Court dismissed KPI's alter ego/veil piercing claim, but allowed KPI's remaining claims to proceed. (*Id.*) On April 21, 2017, TDI filed a Motion for Summary Judgment. (ECF No. 47.) KPI opposes the motion and filed a cross-motion on May 12, 2017. (ECF No. 12.)

## II. LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual dispute is genuine only if there is "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party," and it is material only if it has the ability to "affect the outcome of the suit under governing law." *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Anderson*, 477 U.S. at 248. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, (1986); *Curley v. Klem*, 298 F.3d 271, 276-77 (3d Cir. 2002). "Summary judgment may not be granted . . . if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed." *Nathanson v. Med. Coll. of Pa.*, 926 F.2d 1368, 1380 (3rd Cir.

1991) (citing *Gans v. Mundy*, 762 F.2d 338, 340 (3d Cir.), *cert. denied*, 474 U.S. 1010 (1985)); *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 744 (3d Cir. 1996).

The party moving for summary judgment has the initial burden of showing the basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "If the moving party will bear the burden of persuasion at trial, that party must support its motion with credible evidence . . . that would entitle it to a directed verdict if not controverted at trial." *Id.* at 331. On the other hand, if the burden of persuasion at trial would be on the nonmoving party, the party moving for summary judgment may satisfy Rule 56's burden of production by either (1) "submit[ting] affirmative evidence that negates an essential element of the nonmoving party's claim" or (2) demonstrating "that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Id.* Once the movant adequately supports its motion pursuant to Rule 56(c), the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324; *see also Matsushita*, 475 U.S. at 586; *Ridgewood Bd. of Ed. v. Stokley*, 172 F.3d 238, 252 (3d Cir. 1999). In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the factfinder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

There can be "no genuine issue as to any material fact," however, if a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322-23. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders

all other facts immaterial." *Id.* at 323; *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992).

### III. DECISION

TDI argues no contract, whether express or implied, existed between KPI and TDI for fuel delivery to the Yorktown. (ECF No. 47-64 at 4-12.) KPI argues TDI and KPI entered into an express oral or written contract or an implied contract. (ECF No. 48 at 12-18.) Specifically, KPI argues that "[d]uring the due diligence period, when [McGuire] of KPI requested Vasos to provide financial statements evidencing the recipient's ability to pay for the fuel it was receiving, Vasos, from a TDI email, provided the TDI balance sheet." (*Id.* at 12.) KPI further argues the invoices provided for the Yorktown could be considered an express agreement between KPI and TDI. (*Id.*)

To succeed on a breach of contract claim under New Jersey law, "a plaintiff must establish three elements: (1) the existence of a valid contract between the parties; (2) failure of the defendant to perform its obligations under the contract; and (3) a causal relationship between the breach and the plaintiff's alleged damages." *Sheet Metal Workers Int'l Ass'n Local Union No. 27, AFL-CIO v. E.P. Donnelly, Inc.*, 737 F.3d 879, 900 (3d Cir. 2013) (citation omitted). "Under New Jersey law, a party must prove the existence of a contract by showing that: (1) there was a meeting of the minds; (2) there was an offer and acceptance; (3) there was consideration; and, (4) there was certainty in the terms of the agreement." *Allen v. Bloomingdale's, Inc.*, 225 F. Supp. 3d 254, 258 (D.N.J. 2016) (citation omitted).

"[T]he question of whether a contract exists between two parties is fact-specific." *Barak v. Obioha*, 74 F. App'x 164, 166 (3d Cir. 2003). "Under New Jersey law, an enforceable contract is created when two parties agree on essential terms and manifest an intention to be bound by those terms.'" *Id.* (quoting *Weichert Co. Realtors v. Ryan*, 608 A.2d 280, 284 (N.J. 2002)). A contract

11

"may be evidenced by an express written document or implied from the parties' conduct and the surrounding circumstances." *Id.*; *see also Troy v. Rutgers*, 774 A.2d 476, 482 (N.J. 2001) ("The modern view is that, '[j]ust as assent may be manifested by words or other conduct, sometimes including silence, so intention to make a promise may be manifested in language or by implication from other circumstances.'"). "The distinction between express and implied contracts rests on alternative methods of contract formation." *Baer v. Chase*, 392 F.3d 609, 616 (3d Cir. 2004). "Contracts are 'express' when the parties state their terms and 'implied' when the parties do not state their terms." *Id.* The distinction is based on the way the parties manifest their mutual assent. *Id*; *see In re Penn. Cent. Transp. Co.*, 831 F.2d 1221, 1228 (3d Cir. 1987) ("An implied-in-fact contract, therefore, is a true contract arising from mutual agreement and intent to promise, but in circumstances in which the agreement and promise have not been verbally expressed. The agreement is rather inferred from the conduct of the parties."); *see Baltimore O.R. Co. v. United States*, 261 U.S. 592, 597 (1923). As such, the terms "express" and "implied" do not signify different kinds of contracts, "but rather reference the evidence by which the parties demonstrate their agreement." *Baer*, 392 F.3d at 616; *see St. Paul Fire & Marine Ins. Co. v. Indem. Ins. Co. of N. Am.*, 158 A.2d 825, 828 (N.J. 1960).

"A contract arises from offer and acceptance, and must be sufficiently definite that the performance to be rendered by each party can be ascertained with reasonable certainty." *Cumberland Farms, Inc. v. N. J. Dep't of Envt'l Prot.*, 148 A.3d 767, 776 (N.J. Super. Ct. App. Div. 2016) (citation omitted). "In the very nature of the contract, acceptance must be absolute" and "unequivocally shown." (*Id.*) A party may assent to the terms of an offer through either words or conduct. *Weichert Co. Realtors*, 608 A.2d 280, 284-85. "Acceptance by performance requires that at least part of what the offer requests be performed or tendered and includes acceptance by a

performance which operates as a return promise." *DirecTech Del., Inc. v. Allstar Satellite*, Inc., No. 08-3527, 2010 WL 1838573, at *4 (D.N.J. May 6, 2010) (citation omitted). "In addition, the acceptance of mutual obligations must be accompanied by consideration, which need be nothing more than a 'very slight advantage to one party, or a trifling inconvenience to the other.'" *Id.* (citing *Martindale v. Sandvik*, 800 A.2d 872, 879 (N.J. 2002).

"When interpreting a contract, the court's goal is to ascertain the 'intention of the parties to the contract as revealed by the language used, taken as an entirety; and, in the quest for intention, the situation of the parties, the attendant circumstances, and the objects they were thereby striving to attain. . . .'" *Driscoll Const. Co., Inc. v. State, Dep't of Transp.*, 853 A.2d 270, 276 (N.J. Super. Ct. App. Div. 2004) (quoting *Onderdonk v. Presbyterian Homes of N.J.*, 425 A.2d 1057, 1063-64 (N.J. 1981) (internal citations omitted)). "The interpretation or construction of a contract is usually a legal question for the court, 'suitable for a decision on a motion for summary judgment.'" *Id.* (internal citations omitted). However, "where there is uncertainty, ambiguity or the need for parol evidence in aid of interpretation, then the doubtful provision should be left to the jury." *Id.* (internal citations omitted). "While in general the existence of a contract is a question of law for the Judge to decide, [w]hen the evidence is conflicting it is for the jury to determine whether a contract does in fact exist, and, if so, what are its terms?" *DirecTech Del., Inc.*, 2010 WL 1838573, at *3 (quoting *West v. IDT Corp.*, No. 01-4372, 2008 WL 762459, *5 (D.N.J. March 19, 2008) (citing *Am. Lumbering Mfg. Co. v. Atl. Mill & Lumber Co.*, 290 F. 632, 634 (3d Cir. 1923)); *see also Elliott & Frantz, Inc. v. Ingersoll–Rand Co.*, 457 F.3d 312, 327 (3d Cir. 2007)).

Following a thorough review of all memoranda and statements of facts, it is apparent there are issues of material fact that remain in dispute before summary judgment can be entered in favor of either party as a matter of law on a breach of contract theory. These factual issues include: (1)

13

whether KDI and TDI entered into an express contract (whether the invoices constituted an express contract or the parties entered into an express oral contract); (2) whether TDI is considered a merchant under the U.C.C. for statute of frauds purposes; (3) whether the parties entered into an implied contract; and (4) whether KDI could recover under a theory of quantum meruit (whether TDI accepted the fuel by paying for it on one occasion and whether KPI expected TDI to pay for the fuel). Because the Court's role in a motion for summary judgment is not to evaluate the evidence and decide the truth of the matter but instead to determine whether there is a genuine issue for trial, *Anderson*, 477 U.S. at 249, it cannot grant summary judgment in favor of either party at this time.

As the Third Circuit noted, "there are several important factual disputes which bear on the binding nature of the agreement." *West v. IDT Corp.*, 241 F. App'x 50, 53 (3d Cir. 2007). "Among these are whether the parties intended the agreement to be binding . . . ." *Id.* An "enforceable contract is created when two parties agree on essential terms and manifest an intention to be bound by those terms." *Barak*, 74 F. App'x at 166 (citation omitted). Most striking is the fact that the parties here are in deep conflict as to whether there was in fact a binding contract, whether express or implied. This alerts the Court to the fact that there are material questions as to whether a contract does in fact exist. For example, TDI argues undisputed materials of fact establish that no contract, either express or implied, existed between KPI and TDI for fuel delivery to the Yorktown (ECF No. 47-64 at 4-12), whereas KPI argues TDI and KPI entered into an express contract, in which Vasos represented TDI intended to perform the obligations under the contract. (ECF No. 48 at 12.) Specifically, KPI argues that "[d]uring the due diligence period, when [McGuire] of KPI requested Vasos to provide financial statements evidencing the recipient's ability to pay for the fuel it was receiving, Vasos, from a TDI email, provided the TDI balance sheet." (*Id.*) KPI further argues the

invoices provided for the Yorktown could be considered an express agreement between KPI and TDI. (*Id.*) In the alternative, KPI argues TDI and KPI entered into an implied contract. (*Id.* at 15-18.)

The Court likewise finds there are numerous issues of material fact as to whether or not KPI and TDI entered into any contract. KPI presents no written contract that indicates a sale between the parties and bears TDI's signature, and TDI did not sign a guarantee of EMC's obligations to KPI. (ECF No. 47-12 at 27:6-8, 144:6-145:1.) However, a jury could find the invoices to be express contracts between KPI and TDI. The invoices were billed to "M/V Yorktown and/or master/ owners/ *charterers/* managers/ operators and/or Explorer Maritime Cruises LLC c/o Travel Dynamics International." (ECF No. 47-1 ¶ 27 and ECF No. 48-16 ¶¶ 22-23 (emphasis added.) KPI used TDI as a "c/o" address "because [it was] never provided an address for [EMC]." (ECF No. 47-12 at 50:22-51:1.) Although TDI specifically asked that all bunker billing for the Yorktown be billed to EMC (ECF No. 47-1 ¶ 35 and ECF No. 48-16 ¶ 35), and KPI complied with all requested changes and changed the name of TDI sub-accounts to EMC (ECF No. 48-16 ¶¶ 34-35), the invoices continued to be addressed to "M/V Yorktown and/or master/ owners/ charterers/ managers/ operators and/or Explorer Maritime Cruises LLC c/o Travel Dynamics International" with no objection from TDI, Vasos or the captain of Yorktown. Because Vasos was the owner of both EMC and TDI and the captain of Yorktown had a TDI email, a reasonable jury could infer that either Vasos or the captain received the invoices on behalf of TDI, and not EMC. In addition, TDI never provided KPI with its address to remove TDI as the c/o address.

Moreover, while TDI would typically send postdated checks from EMC to pay down the balance (ECF No. 47-6 at 91:16-20, 94:2-3), in October 2013, EMC's bank prevented a check

15

from clearing to KPI to cover an invoice for fuel for the Yorktown. (ECF No. 47-1 ¶ 43 and ECF No. 48-16 ¶ 43.) Therefore, TDI stepped in and made the payment in order to allegedly "avoid arresting the vessel and disrupting the cruise and inconveniencing the passengers." (ECF No. 47-3 at 111:6-15.) KPI's argument—that a course of performance/dealing existed between KPI and TDI because it addressed all invoices to charterers and TDI paid one invoice—ignores the fact that EMC paid over one hundred invoices to KPI for fuel delivered to the Yorktown and that TDI requested all invoices be directed at EMC. (*See* ECF No. 47-19.) Accordingly, reasonable inferences can be drawn either way as to whether or not an express contract existed. *Nathanson*, 926 F.2d at 1380 ("Summary judgment may not be granted . . . if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed.") (citation omitted).

Further, KPI performed its due diligence on the Yorktown and knew EMC was the owner of the vessel and that EMC and TDI were separate entities. (ECF No. 47-1 ¶ 13; ECF No. 47-6 at 30:4-6; and ECF No. 47-12 at 19:17-23, 25:23-26:4, 29:18-30:2.) On the other hand, when KPI requested financial statements from Vasos in September 2011, Vasos provided TDI's bank as a reference and TDI's financial statements instead of EMC's or Aquarius', which he sent from his TDI email address, which a jury could find creates either an implied or express oral contract. (ECF No. 14 and ECF No. 48-3 at 3-8.)

In addition, KPI first supplied fuel to the Yorktown in approximately October 2011. (ECF No. 47-6 at 62:23-63:17.) Vasos was the initial contact for purchasing fuel at this time, but later referred McGuire to the captain of the Yorktown and provided her with the captain's email address, a TDI email address. (ECF No. 48-3.) Initially, the Yorktown captain's email address was a TDI email address, but at some point, it changed to a Yorktown email address. (ECF No. 47-22.) As a

result, a jury could interpret this to mean that TDI, and not EMC or Yorktown, was ordering the fuel. Additionally, during the term of the Charter Agreement period, TDI, as the charterer, was required "to pay the Owner for the hiring of the Vessel the sum of Twenty-Eight Thousand Five Hundred ($28,500.00) per day," which a reasonable jury could interpret to signify that EMC was required to provide the fuel for the Yorktown. (ECF No. 47-1 ¶ 7; ECF No. 48-16 ¶ 7; ECF No. 47-31 at 3 of 10.) Conversely, TDI's Yorktown travel brochure stated, TDI "reserves the right to charge a fuel supplement, without prior notice, if the NYMEX oil price exceeds $85 per barrel," which might infer TDI pays for the Yorktown's fuel. (ECF No. 49-15.) Therefore, all these factual disputes require a jury determination as to whether there was a contract or, in the alternative, whether KPI could recover under a theory of quantum meruit. While, in general, the existence of a contract is a question of law for the Court to decide, here, "the evidence is conflicting" and therefore, "it is for the jury to determine whether a contract does in fact exist, and, if so, what are its terms?" *DirecTech Del., Inc.*, 2010 WL 1838573, at *3 (citations omitted). Accordingly, KPI and TDI's Motions for Summary Judgment are **DENIED**.

IV. **CONCLUSION**

For the reasons set forth above TDI's Motion for Summary Judgment (ECF No. 47) and KPI's Cross-Motion for Summary Judgment (ECF No. 48) are **DENIED**.

**Date:** January 22, 2018    */s/ Brian R. Martinotti*
           **HON. BRIAN R. MARTINOTTI**
           **UNITED STATES DISTRICT JUDGE**